UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――― x
GEORGE G. SCOTT, Individually and on : Civil Action No. 1:12-cv-05124-LTS
Behalf of All Others Similarly Situated, :
                                        : CLASS ACTION
              Plaintiff,                :
                                        : AMENDED CLASS ACTION COMPLAINT
      vs.                               : FOR VIOLATIONS OF THE FEDERAL
                                        : SECURITIES LAWS
GENERAL MOTORS COMPANY, et al.,         :
                                        :
              Defendants.               :
                                        :
―――――――――――――――――――――――― x

Lead Plaintiff Teamsters Local 710 Pension Fund ("Lead Plaintiff" or "Plaintiff") makes the following allegations based upon the investigation undertaken by its counsel, which included analyses of publicly available news articles and reports, public filings, securities analysts' reports and advisories about General Motors Company ("GM" or the "Company"), interviews of former GM employees, interviews of people knowledgeable about GM's business and sales practices, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities action on behalf of a Class consisting of all those who purchased GM common stock or Series B Mandatory Convertible Junior Preferred Stock ("Series B preferred stock") pursuant and/or traceable to GM's initial public offering on or about November 18, 2010 (the "IPO" or the "Offering"). This action seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act") relating solely to strict liability and negligence claims.

2. Defendant GM describes itself as "a leading global automotive company" who "seek[s] to distinguish [its] vehicles through superior design, quality, reliability, telematics (wireless voice and data), and infotainment and safety within their respective vehicle segments." The Company is the successor entity solely for accounting and financial reporting purposes to General Motors Corporation ("Old GM").

3. After years of financial turmoil and gross mismanagement, Old GM was the beneficiary of a government bailout, receiving billions of dollars in funding from the United States Department of Treasury (the "U.S. Treasury") from December 2008 through 2009. One of Old GM's many financial troubles stemmed from its inability to adequately control its inventory levels, especially with its line of pickup trucks. Specifically, for many years, Old GM maintained very high

dealer inventory levels, often far above industry standards. As a condition of receiving loans from the U.S. Treasury, the Company was required to create an aggressive plan to turn itself around (the "Viability Plan"). The Viability Plan consisted of significant cost reduction and restructuring actions, which included, among other things, reducing Old GM's indebtedness and certain retiree healthcare obligations, and "[e]xtended shutdowns of certain North American manufacturing facilities in order to reduce dealer inventory."

4. Notwithstanding its newly devised Viability Plan, Old GM realized that it could no longer pay off its debts, let alone maintain a profitable business, even after it received billions of dollars from the U.S. Treasury. Accordingly, Old GM, along with three of its domestic direct and indirect subsidiaries, succumbed to economic pressures and filed for bankruptcy relief in June 2009. Upon emerging from bankruptcy, the Company vowed to continue operating under the Viability Plan.

5. In November 2010, GM conducted the biggest initial public offering in U.S. history (at the time), by which certain selling shareholders, including the U.S. Treasury, offered 478 million shares of common stock at $33 per share and 87 million shares of Series B preferred stock at $50 per share. The IPO raised a record amount of over $23 billion, including over-allotments.

6. The registration statement (the "Registration Statement"), which incorporated a prospectus (the "Prospectus"), issued in connection with the IPO, was negligently prepared and therefore contained inaccurate statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and was not prepared in accordance with the rules and regulations governing its preparation. Specifically, as detailed further herein, the Registration Statement contained materially false and misleading statements relating to GM's inventory levels,

the Company's ability to both adequately maintain and reduce dealer inventories and the Company's inventory practices.

7. Additionally, as detailed further herein, during the IPO road show, Company representatives made misleading statements concerning the Company's inventory practices. For example, Dan Ammann, GM's Vice President of Finance and Treasurer, stated that the Company made "significant progress in reducing dealer inventories."

8. Unbeknownst to investors, however, at the time of the IPO, GM was back to much of the same inventory practices that had gotten the Company in trouble in the first place – namely, it continued to unload inordinate amounts of vehicle inventories onto its dealers, padding up its sales figures ahead of the IPO.

9. In the months following the IPO, reports began to surface that GM had engaged in an extraordinary inventory build-up at the time of the IPO and following it. In particular, an article published by *Bloomberg Business Week* on July 5, 2011 revealed that GM may have been unloading excessive inventory on dealers, a practice known as "channel stuffing," in order to create the false impression that GM was recovering and sales and revenues were rising. The *Bloomberg Business Week* article stated that GM's truck inventory swelled to 122 days worth of average sales whereas, by comparison, GM's less profitable car inventory was limited to 60 to 70 days of average sales, Ford was maintaining only a 79-day inventory on comparable trucks, and GM's truck inventory during the years 2002-2010 had similarly averaged only 78 days of average sales.

10. Indeed, by November 30, 2011, only a year after the IPO, GM dealer inventories were 30% higher than they were on September 30, 2010 (the end of the last full quarter before the November 18, 2010 IPO) and 62% higher than they were at the end of 2009.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(1), and 77o].

12. The Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], and 28 U.S.C. §1331.

13. This Court has personal jurisdiction over the Defendants pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] because they transact business and/or have offices in this District.

14. Venue is properly laid in this District pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1391(a), (b), and (c). The acts and conduct complained of herein occurred in substantial part in this District. The Offering was marketed in this District, the lead underwriters on the IPO maintain their principal places of business in this District and GM common stock and GM Series B preferred stock are traded over the New York Stock Exchange ("NYSE"), which is based in this District.

15. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, the mails and telephonic communications and the facilities of the NYSE, a national securities market.

## PARTIES

16. Lead Plaintiff purchased GM common stock, as set forth in its certification previously filed in this case and incorporated herein by reference, pursuant and/or traceable to the Company's IPO and was damaged thereby.

17. Defendant GM describes itself as a global automotive company whose business is diversified across products and geographic markets, with operations and sales in over 120 countries. The Company was formed by the U.S. Treasury in 2009. GM is incorporated under the laws of the

- 4 -

State of Delaware, with its corporate headquarters at 200 Renaissance Center, Detroit, Michigan. The Company is the successor entity solely for accounting and financial reporting purposes to Old GM, which along with three of its domestic direct and indirect subsidiaries, filed voluntary petitions for relief under Chapter 11 (the "Bankruptcy Proceedings") of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

18. Defendant Edward E. Whitacre, Jr. ("Whitacre") was Chairman of the Board of Directors of GM (the "Board") at the time of the IPO. Defendant Whitacre signed the Registration Statement issued in connection with the IPO.

19. Defendant Christopher P. Liddell ("Liddell") was Vice Chairman of the Board and Chief Financial Officer at GM at the time of the IPO. Defendant Liddell signed the Registration Statement.

20. Defendant Nick S. Cyprus ("Cyprus") was Vice President, Controller, and Chief Accounting Officer at GM at the time of the IPO. Defendant Cyprus signed the Registration Statement.

21. Defendant Daniel F. Akerson ("Akerson") was the Chief Executive Officer at GM at the time of the IPO. Defendant Akerson signed the Registration Statement.

22. Defendant David Bonderman ("Bonderman") was a Director of GM at the time of the IPO. Defendant Bonderman signed the Registration Statement.

23. Defendant Enroll B. Davis, Jr. ("Davis") was a Director of GM at the time of the IPO. Defendant Davis signed the Registration Statement.

24. Defendant Stephen J. Girsky ("Girsky") was a Director of GM at the time of the IPO. Defendant Girsky signed the Registration Statement.

25. Defendant E. Neville Isdell ("Isdell") was a Director of GM at the time of the IPO. Defendant Isdell signed the Registration Statement.

26. Defendant Robert D. Krebs ("Krebs") was a Director of GM at the time of the IPO. Defendant Krebs signed the Registration Statement.

27. Defendant Philip A. Laskaway ("Laskaway") was a Director of GM at the time of the IPO. Defendant Laskaway signed the Registration Statement.

28. Defendants Whitacre, Liddell, Cyprus, Akerson, Bonderman, Davis, Girsky, Isdell, Krebs, and Laskaway are collectively referred to herein as the "Individual Defendants."

29. Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is an investment bank headquartered at 1585 Broadway, New York, NY 10036. Morgan Stanley was one of the underwriters and served as a representative for the underwriters for the IPO, and agreed to distribute 76,480,000 shares of GM common stock and 9,570,000 shares of Series B preferred stock.

30. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is an investment bank with offices at 277 Park Avenue, New York, NY 10172. J.P. Morgan was one of the underwriters and served as a representative for the underwriters for the IPO, and agreed to distribute 76,480,000 shares of GM common stock and 9,570,000 shares of Series B preferred stock.

31. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an investment bank with offices at 4 World Financial Center, North Tower, New York, NY 10080. Merrill Lynch was one of the underwriters for the IPO and agreed to distribute 35,508,571 shares of GM common stock and 7,830,000 shares of Series B preferred stock.

32. Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment bank with offices at 388 Greenwich Street, New York, NY 10013. Citigroup was one of the underwriters for

the IPO and agreed to distribute 35,508,571 shares of GM common stock and 7,830,000 shares of Series B preferred stock.

33. Defendant Barclays Capital Inc. ("Barclays") is an investment bank with offices at 200 Park Avenue, New York, NY 10166. Barclays was one of the underwriters for the IPO and agreed to distribute 35,508,571 shares of GM common stock and 7,830,000 shares of Series B preferred stock.

34. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is an investment bank with offices at 11 Madison Avenue, New York, NY 10010. Credit Suisse was one of the underwriters for the IPO and agreed to distribute 35,508,571 shares of GM common stock and 7,830,000 shares of Series B preferred stock.

35. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment bank with offices at 60 Wall Street, New York, NY 10005. Deutsche Bank was one of the underwriters for the IPO and agreed to distribute 35,508,571 shares of GM common stock and 7,830,000 shares of Series B preferred stock.

36. Defendant Goldman, Sachs & Co. ("Goldman Sachs") is an investment bank with offices at 200 West Street, New York, NY 10282. Goldman Sachs was one of the underwriters for the IPO and agreed to distribute 35,508,571 shares of GM common stock and 7,830,000 shares of Series B preferred stock.

37. Defendant RBC Capital Markets Corporation ("RBC Capital Markets") is an investment bank with offices at One Liberty Plaza, 165 Broadway, New York, NY 10006. RBC Capital Markets was one of the underwriters for the IPO and agreed to distribute 35,508,571 shares of GM common stock and 7,830,000 shares of Series B preferred stock.

38. Defendant Banco Bradesco BBI S.A. ("Banco Bradesco") is an investment bank with offices at 450 Park Avenue, New York, NY 10022. Banco Bradesco BBI S.A. was one of the underwriters for the IPO and agreed to distribute 12,547,500 shares of GM common stock and 2,218,500 shares of Series B preferred stock.

39. Defendant CIBC World Markets Corp. ("CIBC") is an investment bank with offices at 425 Lexington Avenue, New York, NY 10017. CIBC was one of the underwriters for the IPO and agreed to distribute 12,547,500 shares of GM common stock and 2,218,500 shares of Series B preferred stock.

40. Defendant Commerz Markets LLC ("Commerz Markets") is a securities brokerage firm with offices at 2 World Financial Center, New York, NY 10281. Commerz Markets was one of the underwriters for the IPO and agreed to distribute 12,547,500 shares of GM common stock and 2,218,500 shares of Series B preferred stock.

41. Defendants referenced in paragraphs 29-40 above are collectively referred to herein as the "Underwriters" or "Underwriter Defendants."

## CLASS ACTION ALLEGATIONS

42. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all those who purchased the common stock or Series B preferred stock of GM pursuant and/or traceable to the IPO on or about November 18, 2010 and were damaged thereby (the "Class"). Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

43. The members of the Class are so numerous that joinder of all members is impracticable. GM sold more than 478 million shares of its common stock and 87 million shares of its Series B preferred stock in connection with its IPO. The precise number of Class members is unknown to Plaintiff at this time, but is believed to be in the tens of thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of GM, its transfer agent, or the underwriters of the IPO. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

44. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

45. Plaintiff's claims are typical of the claims of other members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

46. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

47. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether the Registration Statement issued in connection with the IPO negligently omitted and/or misrepresented material facts about GM and its business; and

(c) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### GM and Its Business

48. Defendant GM describes itself as "a leading global automotive company" who "seek[s] to distinguish [its] vehicles through superior design, quality, reliability, telematics (wireless voice and data) and infotainment and safety within their respective vehicle segments." GM's business is diversified across products and geographic markets, with operations and sales in over 120 countries. The Company has 71 assembly facilities and 21,000 independent dealers worldwide. GM offers customers a selection of passenger cars, crossover vehicles, light trucks, sport utility vehicles, vans, and other vehicles.

49. Defendant GM was formed by the U.S. Treasury in 2009. The Company is the successor entity solely for accounting and financial reporting purposes to Old GM. Prior to July 10, 2009, the Company's business was operated by Old GM.

50. During 2008, it became evident to Old GM that it could not operate without financial aid from the government. In Old GM's first quarter 2009 Form 10-Q filed with the SEC on May 8, 2009, Old GM stated, in pertinent part, as follows:

> As a result of these economic conditions and the rapid decline in our sales in the three months ended December 31, 2008 we determined that, despite the far reaching actions we had then taken to restructure our U.S. business, we would be unable to pay our obligations in the normal course of business in 2009 or service our debt in a timely fashion, which required the development of a new plan that depended on financial assistance from the U.S. Government.

51. As a result, between December 2008 and early 2009, Old GM entered into a series of loan and security agreements with the U.S. Treasury. Specifically, in December 2008, Old GM entered into a loan and security agreement with the U.S. Treasury pursuant to which the U.S. Treasury would provide Old GM with a $13.4 billion secured term loan facility. The agreement was amended in January 2009 in order to increase the availability under the loan facility to $15.4 billion (the "UST Loan Agreement"). Over the course of several months, Old GM borrowed the entire $15.4 billion. In addition, in January 2009, Old GM entered into a second secured loan and security agreement with the U.S. Treasury pursuant to which Old GM borrowed $884 million and utilized the funds to purchase additional common membership interests in GMAC, a subsidiary of GM, from 49% to 60% (the "UST GMAC Loan Agreement").

52. The loans under the UST Loan Agreement and the UST GMAC Loan Agreement were scheduled to mature on December 30, 2011 and January 16, 2012, respectively. In order to avoid acceleration of such maturity dates, Old GM was required to devise a plan to achieve and sustain long-term viability, international competitiveness and energy efficiency, which was to be certified by the President's Designee. Old GM submitted a draft viability plan to the President's Designee by March 30, 2009 (the "Initial Viability Plan"). The certification deadline was March 31, 2009.

53. The Initial Viability Plan was rejected by the President's Designee as "not viable and required substantial revisions." However, the U.S. government announced that it would offer Old GM adequate additional working capital financing for a period of 60 days while it worked with Old GM to develop and implement a more accelerated and aggressive restructuring that would provide Old GM with a sound long-term foundation. Accordingly, on March 31, 2009, Old GM and the U.S. Treasury entered into amendments to the UST Loan Agreement and the UST GMAC Loan Agreement to postpone the certification deadline to June 1, 2009.

54. Old GM made further modifications to the Initial Viability Plan in an attempt to satisfy the requirement that it undertake a substantially more accelerated and aggressive restructuring plan (the "Revised Viability Plan"). The Revised Viability Plan contemplated significant cost reduction and restructuring actions, which included, among other things, reducing Old GM's indebtedness and certain retiree healthcare obligations, and "[e]xtended shutdowns of certain North American manufacturing facilities in order to reduce dealer inventory." Indeed, as described in detail below, Old GM had problems maintaining adequate inventory levels for many years.

**The Bankruptcy Proceedings**

55. Old GM's inability to complete the cost reduction and restructuring actions in its Revised Viability Plan resulted in extreme liquidity constraints. As a result, on June 1, 2009, Old GM and certain of its direct and indirect subsidiaries filed voluntary petitions for bankruptcy protection.

56. From December 2008 through July 2009, Old GM borrowed more than $20 billion from the U.S. Treasury.

57. On July 10, 2009, through certain of its subsidiaries and with financing partially provided by the U.S. Treasury, the Company acquired substantially all of the assets and assumed

certain liabilities of Old GM. Upon emergence from the Bankruptcy Proceedings, the U.S. Treasury held a 60.8 percent interest in the Company.

**The IPO**

58. In 2010, the Company revealed that it planned to return to the public stock markets through an initial public offering. Accordingly, on or about August 18, 2010, GM filed the Registration Statement with the SEC on Form S-1 for the IPO. After filing the initial draft in August 2010, GM filed with the SEC several amendments to the Registration Statement on Form S-1/A, the last one being filed on or about November 17, 2010.

59. On or about November 18, 2010, the Prospectus with respect to the IPO, which forms part of the Registration Statement, became effective.

60. In connection with the IPO, 478 million shares of GM's common stock were sold to the public at $33 per share, thereby raising over $15.7 billion. In addition to the above-referenced 478 million shares, the IPO included an over-allotment option granted to the Underwriters to purchase up to an additional 71.7 million shares of common stock.

61. Concurrently with the Offering, GM also made a public offering of 87 million shares of the Company's Series B preferred stock to be sold at $50 per share. In that offering, the Underwriters were granted an option to purchase an additional $13 million shares of Series B preferred stock to cover over-allotments.

62. On or about November 26, 2010, the Underwriters exercised in full their over-allotment options to purchase 71.7 million shares of common stock from the selling stockholders, for a total of $2.37 billion. In total 549.7 million shares of GM common stock were sold in the IPO at $33 per share, thereby raising more than $18.14 billion. In addition, the Underwriters exercised their over-allotment option to purchase 13 million shares of the Series B preferred stock for a total of

$650 million. With the exercise of the over-allotment options by the Underwriters, the IPO raised a record amount of over $23 billion.

63.     The proceeds of the sales of common stock and the Series B preferred stock from the IPO went to the selling stockholders, including the U. S. Treasury.

**History of Concerns over Inventory Controls at GM**

64.     Many automotive industry insiders consider auto inventory levels, or "days supply," as the real measure of relative success in the auto industry. The number is derived by subtracting sales from production. This demonstrates the state of dealer inventories along with vehicles in transit, and others produced, but still in automaker hands. The days supply allows auto manufacturers to determine how long it would take for the inventory to be exhausted, or selections to be so limited that sales stumble, at the current sales and production rates. For this reason, days supply can be more important than the daily sales rate for manufacturers, although both counts can drive production scheduling.

65.     GM records revenue when vehicles are shipped to dealerships, rather than when they are actually sold to the public. Accordingly, controlling dealer inventory levels is very important in giving GM shareholders a true measure of the Company's revenues, as well as its overall success.

66.     Maintaining adequate inventory levels, or days supply, has been a major concern for GM for years, even predating the Bankruptcy Proceedings. Indeed, for many years, GM has maintained very high inventory levels, much higher than the industry norm. Some have described GM's inventory practices as "channel stuffing," a practice whereby excess inventory is "sold" to dealerships so that the manufacturer, in this case GM, can record those sales on its books, creating the false appearance of revenues, even while those cars remain unsold on dealer lots.

67.     Media reports confirm GM's long-standing problems with maintaining adequate inventory levels. Indeed, in a June 2008 article titled "GM Launches 0% Financing For 72 Months;

Cuts More Production," which appeared in *Edmunds AutoObserver*, it was noted that "GM needs to clean up [its] inventory." According to the article, "GM ha[d] about 50,000 too many trucks and SUVs" and to that end, Old GM was to "cut another 170,000 units from its production target in the second half of 2008 by extending summer vacation at a number of mostly truck and SUV plants." Further, the article noted that "[a]ccording to Edmunds.com's analysis, the days-to-turn – the time between a vehicle being delivered at a dealership to it being purchased – is a high 103 days for GM's large trucks and 71 days for large SUVs."[1]

68. Old GM's inventory problems continued in the months leading up to the Bankruptcy Proceedings. Indeed, in early March 2009, the website *The Truth About Cars* posted an article titled "GM Leads the League of Extraordinary Inventory at 161 Days Supply."[2] The article compared certain auto manufacturers and their respective days supply of inventory, which consisted of the following:

| Maker | Days Supply of Inventory |
|---|---|
| **GM** | 161 |
| **Chrysler** | 151 |
| **Honda** | 125 |
| **Ford** | 120 |
| **Toyota** | 91 |
| **Nissan** | 85 |
| **Hyundai** | 79 |
| **Industry Target** | 60 |

---

[1] http://www.edmunds.com/autoobserver-archive/2008/06/gm-launches-0-financing-for-72-months-cuts-more-production.html (last visited December 18, 2012).

[2] http://www.thetruthaboutcars.com/2009/03/gm-leads-league-of-extraordinary-inventory-at-161-days-supply/ (last visited December 18, 2012).

69. In its Form 10-Q for the quarter ended March 31, 2009, which it filed with the SEC on May 8, 2009, Old GM noted that its inventory "is high from a days' supply standpoint given current lower industry sales rates." Old GM added that: "[t]o address this issue and bring inventory quantities in line with a more optimal 75 to 90 days supply, we have announced North American production reductions of approximately 190,000 vehicles during the second and early third quarters of 2009."

70. In the Form 10-Q for the 1Q2009, Old GM noted that as part of its Revised Viability Plan it "focused on more conservative market share and dealer inventory assumptions, resulting in more conservative factory unit sales (FUS) compared to our February 17 Viability Plan." In addition, as part of its "channel strategy," Old GM stated that its Revised Viability Plan "more aggressively addresses the level of U.S. dealers" and "is intended to facilitate an orderly, customer friendly and cost-effective approach for dealer reductions and inventory disposal."

71. Keeping with its plan, in April 2009, Old GM reported that it would temporarily shut down operations at 13 assembly plants in North America for as long as 13 weeks during the summer of 2009, starting in May 2009 and ending in July 2009. During that time, the Company planned to cut production by 190,000 vehicles. Troy Clarke, Old GM's North America President at the time, told reporters in a conference call: "We are pursuing an aggressive inventory strategy so we can get our dealers and ourselves ready for a clean and quick start to 2010 model year and capitalize on upturn when it occurs."[3] The shutdowns were planned to help control high inventory levels at

---

[3] http://www.edmunds.com/autoobserver-archive/2009/04/gm-names-13-plants-for-shutdowns-cuts-190000-vehicles-from-production-schedule.html (last visited December 18, 2012).

dealerships and bring production in line with slower sales.[4]

72. A June 2009 article titled "How General Motors Lost Its Focus – And Its Way," from the *Ivey Business Journal*, documented Old GM's lack of market focus and further confirmed GM's inventory issues. The article noted that Old GM had "many more dealers than necessary, and certainly many more than most other car companies" which resulted in, among other things: "*[a]n increase in inventory* ("floor plan") and display costs"; and "[a] reduction in dealers' net car margins, *due to longer inventory holding times*."[5, 6]

73. Similarly, on July 6, 2009, *The Truth About Cars* published an article titled "GM's Inventory Woes," which discussed that GM's inventory levels were a major concern for Old GM "for years." According to the article, "[f]alling market share lead to overproduction which lead to incentive addition and falling profitability as [Old] GM tried to help its dealers clear their lots."[7]

74. These problems continued even as Old GM emerged from the Bankruptcy Proceedings a new company and vowed to "reduce dealer inventory" in connection with the Revised Viability Plan.

### At the Time of the IPO, GM Was Engaging in Channel Stuffing Practices and Inflating the Company's Sales Figures

75. Several months after emerging from the Bankruptcy Proceedings as GM, the

---

[4] http://www.pbs.org/newshour/updates/business/jan-june09/gmidling_04-23.html (last visited December 18, 2012).

[5] http://www.iveybusinessjournal.com/topics/strategy/how-general-motors-lost-its-focus-%E2%80%93-and-its-way#.UNDHJuQ0XTo (last visited on December 18, 2012).

[6] All emphasis is added unless otherwise noted.

[7] http://www.thetruthaboutcars.com/2009/07/gms-inventory-woes/ (last visited on December 18, 2012).

Company revealed in 2010 that it planned to return to the public stock markets through the IPO. When GM announced its plans for the IPO, the Company once again vowed to change its poor inventory practices.

76. Notwithstanding its promises that the Company would better control its inventory levels, GM continued to maintain its inventory levels way above industry standards, leading potential investors to believe that GM's revenues were actually higher than they were. For instance, on December 1, 2010, an investor website, *Zerohedge.com*, reported that GM may be back to channel stuffing. The report describes:

> GM reported slightly disappointing sales numbers: the newly IPOed company sold 168,739 cars in November, a 11.4% increase to November 2009, which came in below expectations of a 13% rise. That's mostly noise. What isn't, however, is ***the linear rise in GM's auto inventory safely stashed away at dealers, i.e., unsold.*** . . .[8]

77. According to the report, "beginning in July [2010], GM ... started an aggressive channel stuffing program whereby it offload[ed] tens of thousands of cars (over 110,000 since July) on dealer lots, hoping these will get sold somehow, at some price, all the while dealers enjoy taxpayer subsidized floorplan leases which allows them to hold nearly infinite inventory." In addition, the article reported:

> So what would have happened if in October GM had held its dealer inventory flat (not declining, just flat): well, the top line number would have been 21,000 cars less sold. Which also means that total sales would have been not 169k but 148k, and instead of a 11.4% increase, GM would have reported a drop of 2.4% in November sales YoY . . . .[9]

---

[8] http://www.zerohedge.com/article/channel-stuffing-gm (last visited on December 21, 2012).

[9] http://www.zerohedge.com/article/channel-stuffing-gm (last visited on December 18, 2012). *See also* http://www.thetruthaboutcars.com/2010/12/is-gm-back-to-channel-stuffing/ (last visited on December 18, 2012).

78. As support, the report attached the chart below which "demonstrates what some may argue is nothing less than a blatant case of channel stuffing":



79. The article also pointed out that the Company had boasted its low inventory levels just a year prior by stating: "U.S. Dealer Inventory Reaches 385,000 – Lowest Year-End Level on Record." The report added, "[s]o what happens when the inventory is the highest in years? One will likely not see a comparable statement in today's sales release." Indeed, the Company did not try to spin its high inventory levels as a good thing.

80. Conspicuously missing from GM's monthly sales report was the "days supply" of inventory, which would have tipped investors off that GM was once again stuffing its dealer channels.

81. Additionally, according to the National Legal and Policy Center, on December 13, 2010, less than one month following its IPO, GM reported that it had 93 to 95 days supply of