UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

GEORGE G. SCOTT, Individually and on
Behalf of all Others similarly situated,

        Plaintiffs,

  -v-                                                No. 12CV5124-LTS-JLC

GENERAL MOTORS COMPANY et al.,

        Defendants.

----------------------------------------------------------x

## A<small>MENDED</small> M<small>EMORANDUM</small> O<small>PINION AND</small> O<small>RDER</small>[1]

In this putative class action alleging violations of Sections 11, 12(a)(5), and 15 of the Securities Act of 1933 (the "'33 Act"), Plaintiffs assert claims for alleged material misstatements in the registration statement and other filings made in conjunction with the initial public offering of defendant, General Motors Company ("GM"). By order dated November 21, 2012, the Court appointed Teamsters Local 710 Pension Fund to serve as Lead Plaintiff.[2] Defendants move to dismiss the Amended Class Action Complaint (the "Amended Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

The Court has carefully considered the submissions of the parties. For the

---

[1] This Order amends the Memorandum Opinion and Order entered on September 4, 2014 to correct an error brought to the Court's attention by defendant GM. (See docket entry no. 85.) The amendment corrects an error in the in the second complete sentence of page 17 of the slip opinion – the Court had omitted the word "not." Other minor typographical errors are also corrected.

[2] Lead Plaintiff and the putative class are referred to collectively as "Plaintiffs."

following reasons, Defendants' motion is granted in its entirety, and the Amended Complaint is dismissed with prejudice.

BACKGROUND

The following facts are taken from the Amended Complaint (docket entry no. 54), the documents incorporated by reference therein, and other documents of which the Court may take judicial notice. Plaintiffs' factual allegations are taken as true for the purposes of this motion practice.

GM is a large United States-based automotive company that has operations and sales around the world. (Am. Compl. at ¶ 48.) GM is the successor company to General Motors Corporation ("Old GM"), which filed a bankruptcy petition on June 10, 2009. (Id. at ¶ 4.)

Between December 2008 and its bankruptcy filing, Old GM was the recipient of billions of dollars in government financing, funded through the United States Department of the Treasury. (Id. at ¶ 3.) Old GM had significant problems controlling its dealer inventories of vehicles; specifically, Old GM failed to "adequately control its inventory levels, especially with its line of pickup trucks." (Id. at ¶ 3.) Old GM's dealer inventory levels often exceeded industry standards. (Id.) As a condition of government funding, Old GM was required to create a Viability Plan, which called for "reducing Old GM's indebtedness and certain retiree healthcare obligations, and extended shutdowns of certain North American manufacturing facilities in order to reduce dealer inventory." (Id. (internal quotation marks omitted).) Notwithstanding these efforts, Old GM was unable to become profitable or to service its debt obligations. (Id. at ¶ 4.)

On July 10, 2009, with financing partially provided by the U.S. Treasury, GM acquired substantially all the assets and assumed certain liabilities of Old GM. (Id. at ¶ 57.) GM announced that it would continue to operate under the Viability Plan when it emerged from

bankruptcy as Old GM's successor entity.  (Id. at ¶ 4.)

When Old GM emerged from bankruptcy as GM, the Treasury Department held a 60.8 % ownership interest.  In 2010, GM announced that it would sell shares to the public in an initial offering (the "IPO").  (Am. Compl. at ¶ 58.)  Prior to that offering, GM made periodic filings with the Securities and Exchange Commission (the "SEC"), and monthly reports of its production, sales and dealer inventories in Form 8-K filings.  GM filed a Registration Statement with the SEC in August 2010 and amended the statement several times on SEC Forms S-1/A, the last amendment being filed on November 17, 2010.  (Am. Compl. at ¶ 58.)  On November 18, 2010, the Prospectus for the IPO, a part of the Registration Statement, became effective.  (Id. at ¶ 59.)

On November 18, 2010, in connection with the IPO, the Treasury Department and other shareholders sold 478 million shares of common stock at $33 per share, totaling $15.7 billion in proceeds.  (Id. at ¶ 60.)  None of the common stock was sold by GM.  GM sold an additional 87 million shares of Series B preferred stock concurrently with the IPO for $50 per share, raising $4.35 billion.  (Id. at ¶ 61.)

On June 29, 2012, plaintiff George Scott filed a complaint, alleging that defendants GM, the individual members of GM's board of directors, including defendants Whitacre, Liddell, Cyprus, Akerson, Bonderman, Davis, Girsky, Isdell, Krebs, and Laskaway (together, the "Individual Defendants"), and Morgan Stanley & Co. Inc., J.P. Morgan Securiries LLC, Citigroup Global Markets Inc., Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Goldman Sachs & Co., RBC Capital Markets Corp., Banco Bradesco BBI S.A., CIBC World Markets Corp., and Commerz Markets LLC (together, the

"Underwriters"),[3] committed violations of the '33 Act. Lead Plaintiff filed the Amended Complaint on February 1, 2013. Defendants moved to dismiss the Amended Complaint on April 2, 2013. (Docket entry nos. 57 and 61.) At a hearing on April 12, 2013, Lead Plaintiff declined to seek leave to further amend the complaint in light of the pending motion to dismiss, stating: "[w]e do intend to stand on our complaint." (April 12 Tr. at 3:1-3.)

The Amended Complaint alleges that GM, the Individual Defendants, and the Underwriters violated Sections 11 and 15 of the '33 Act by making material misstatements in the Registration Statement pursuant to which shares of GM common stock were sold to the public in the IPO.[4] (Am. Compl. at ¶ 6.) Lead Plaintiff alleges that Defendants made material misstatements when they stated that they would reduce inventory levels while they were purposefully increasing dealer inventories in an effort to increase reported revenues to shareholders. (Id.)

Lead Plaintiff alleges that GM's "channel stuffing," which it defines as "a practice whereby excess inventory is 'sold' to dealerships so that the manufacturer, in this case GM, can record those sales on its books, creating the false appearance of revenues, even while those cars remain unsold on dealer lots." (Am. Compl. at ¶ 66.) Because the vehicles "stuffed" into a dealership do not increase the demand for a company's vehicles, the company may recognize less revenue during future periods as a result of the increased dealer inventory that must be sold before new revenue is recognized. The Amended Complaint further alleges that

---

[3]   The Court assumes for the purposes of this motion practice that the Underwriters acted as "underwriters" for the IPO, as that term is defined in Section 11 of the '33 Act. See 15 U.S.C. § 77k(a)(5).

[4]   The Amended Complaint also alleges violations of Section 12(a)(2) of the '33 Act. Lead Plaintiff voluntarily dismissed those claims with prejudice on April 1, 2013. (Docket entry no. 55.)

"[m]any automotive industry insiders consider auto inventory levels, or 'days supply,' as the real measure of relative success in the auto industry.  The number is derived by subtracting sales from production."[5]  (Am. Compl. at ¶ 64.)

    Lead Plaintiff notes that GM filed an SEC Form 10-Q shortly before the IPO, which disclosed that:

> [W]e generally recognize revenue upon the release of the vehicle to the carrier responsible for transporting it to a dealer, which is shortly after the completion of production. Vehicle sales data, which includes retail and fleet sales, does not correlate directly to the revenue we recognize during the period. However, vehicle sales data is indicative of the underlying demand for our vehicles, and is the basis for our market share.

(Am. Compl. at ¶ 84.)

    The Amended Complaint identifies three sets of alleged misstatements in the Registration Statement.  First, in paragraph 92, the Amended Complaint asserts that:

> the Registration Statement stated: 'We aim to increase our vehicle profitability by maintaining competitive incentive levels with our strengthened product portfolio and **by actively managing our production levels through monitoring of our dealer inventory levels.'** One of its main cost reduction and restructuring strategies was to effect '[e]xtended shutdowns of certain North American manufacturing facilities **in order to reduce dealer inventory**.'  The Registration Statement stated that pricing vehicles competitively, and 'improved inventory management, will continue to strengthen the reputation of our brands and continue to improve our average transaction price.'

(Am. Compl. at ¶ 92 (emphasis in original).)  The last sentence of paragraph 92 incorporated only fragments of the corresponding sentences from the Registration Statement which appeared in a paragraph labeled "Product Pricing;" the full sentences read as follows:

> In 2011, we will continue to price vehicles competitively, including offering strategic and tactical incentives as required. We believe this strategy, coupled with improved inventory management, will continue to strengthen the reputation

---

[5]   The proffered defining equation of "days supply" appears faulty to the extent it fails to include a temporal period as the denominator.

of our brands and continue to improve our average transaction price.

(GM's Registration Statement at pg. 171.)  Lead Plaintiff asserts that the statements recited in paragraph 92 were false because "GM did not have adequate inventory controls in place," "GM did not monitor dealer inventory levels to ensure that production was consistent with demand," and "GM artificially inflated revenues by continuing to ramp up production and overloading dealerships with excess inventory, which GM then recorded as sales."  (Am. Compl. at ¶ 93.)

In paragraph 94 of the Amended Complaint, Lead Plaintiff alleges that the Registration Statement stated falsely that:

> At September 30, 2010 Inventories of $13.0 billion increased by $2.9 billion (or 29.1 %), primarily due to: (1) increased production resulting from higher demand for our products and new product launches; and (2) higher inventory levels at September 30, 2010 compared to low levels at December 31, 2009 of $5.9 billion that resulted from the year-end shut-down of certain locations.

(Am. Compl. at ¶ 94.)  Lead Plaintiff alleges that these statements are inaccurate because "the increased inventories were the result of channel stuffing and were not attributable to higher demand" and, "at the time of these statements, dealer inventories were rising and trucks were sitting unsold on dealer lots for longer periods of time."  (Am. Compl. at ¶ 95.)

Lead Plaintiff alleges, in paragraph 96 of the Amended Complaint, that the Registration Statement inaccurately stated that:

> Management believes that production volume and vehicle sales data provide meaningful information regarding our operating results. Production volumes manufactured by our assembly facilities are generally aligned with current period net sales and revenue, as we generally recognize revenue upon the release of the vehicle to the carrier responsible for transporting it to a dealer, which is shortly after the completion of production. Vehicle sales data, which includes retail and fleet sales, does not correlate directly to the revenue we recognize during the period. **However, vehicle sales data is indicative of the underlying demand for our vehicles, and is the basis for our market share.**

(Am. Compl. at ¶ 96 (emphasis in original).)  Lead Plaintiff alleges that this statement is

inaccurate because "the increases in vehicle sales data were the result of channel stuffing and were not attributable to higher demand," and "the majority of sales reported by GM were based on estimated sales to final customers and not on actual sales data, and therefore, did not accurately reflect underlying demand."  (Am. Comp. at ¶ 97.)

Finally, Lead Plaintiff alleges that GM made a material omission in its registration statement when it failed to disclose problems in its inventory management, and that such disclosure was required by Item 303 of SEC Regulation S-K.[6]  (Am. Compl. at ¶ 98 (citing 17 C.F.R. § 229.303).)  Lead Plaintiff alleges that, by failing to disclose the alleged "channel stuffing," GM failed to disclose a "trend" that "would have a negative impact on the [GM]'s continuing operations."  (Am. Compl. at ¶ 101.)

The Amended Complaint documents GM's disclosures and news coverage of both Old GM and GM's issues with inventory management.  For example, Lead Plaintiff cites an article from July 6, 2009, which stated that "[f]alling market share lead [sic] to overproduction which lead [sic] to incentive addition and falling profitability as [Old] GM tried to help its dealers clear their lots."  (Am. Compl. at ¶ 73.)  Lead Plaintiff also cited an article published just over a week following the IPO, which noted:

> GM reported slightly disappointing sales numbers: the newly IPOed company sold 168,739 cars in November, a 11.4% increase to November 2009, which came in below expectations of a 13% rise. That's mostly noise. What isn't, however, is the linear rise in GM's auto inventory safely stashed away at dealers, i.e., unsold . . . .

(Am. Compl. at ¶ 76.)  The report relied on the public filings of GM, including Forms 8-K filed

---

[6] Item 303, is Management's Discussion and Analysis ("MD&A").  In it, a registrant must discuss " financial condition, changes in financial condition and results of operations," and "provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations."  17 C.F.R. § 229.303(a)

in the months preceding the IPO that disclosed monthly inventory levels.  Specifically, the GM Form 8-K filed on November 3, 2010, disclosed inventory levels of 515,000 units, and that inventories were 37,000 units higher compared to September 2010, and 72,000 units higher than in October 2009.  (GM's SEC Form 8-K, Nov. 5, 2010.)  This public filing also included disclosure of the 183,759 total vehicle sales to consumers in October 2010 and that there were twenty-seven car sales days in that month.  (Id. at ¶ 12.)  Lead Plaintiff alleges that commentators and analysts followed closely the increasing inventory levels and reported in December 2010 that days supply of inventory at dealerships had increased from 93 to 95 days.  (Id. at ¶ 81.)  Lead Plaintiff alleges that "[c]onspicuously missing from GM's monthly sales report was the 'days supply' of inventory, which would have tipped investors off that GM was once again stuffing its dealer channels."  (Id. at ¶ 80.)  Lead Plaintiff further alleges that, in the year following the IPO, GM's inventory increased 15% to 623,666 units.  (Id. at ¶ 116.)

DISCUSSION

On a motion to dismiss a complaint, the Court accepts the factual allegations in the complaint as true, and draws all reasonable inferences in the plaintiff's favor.  See Roth v. Jennings, 489 F.3d 99, 501 (2d Cir. 2007).  "A pleading that offers labels and conclusions or a formulaic recitation of elements of a cause of action will not do."  Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) (internal citations omitted).  Rather, to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Iqbal, 556 U.S. at 677.  In assessing the sufficiency of a complaint, the Court may also consider any written instrument attached to the complaint, statements or

documents incorporated into the complaint by reference, and documents possessed by or known to the plaintiff on which it relied on in bringing the suit, such as the prospectus. See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

Sections 11 and 15 of the '33 Act impose civil liability on certain persons when registered securities offering documentation contains material misstatements or omissions. 15 U.S.C. §§ 77k, 77o; In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010). Section 11 of the Securities Act provides, in relevant part, that:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may . . . sue—(1) every person who signed the registration statement; (2) every person who was a director of (or person performing similar functions) . . . the issuer at the time of the filing . . . [and] (5) every underwriter with respect to such security.

15 U.S.C.S. § 77k(a) (LexisNexis 2012). To state a claim under Section 11, a complaint must allege that plaintiffs 1) purchased a registered security either from the issuer or in the aftermarket; 2) defendants participated in the offering in a manner sufficient to give rise to liability under Section 11 and; 3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). With respect to the third element, the relevant inquiry "is not whether . . . [the statement] later turned out to be correct, but rather whether the [defendant] knew or had reason to know, at the time the offering documents were filed, that the statement was untrue." Zirkin v. Quanta Capital Holdings Ltd., No. 07 Civ. 851, 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009). Plaintiffs must, "at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." Lin v. Interactive Brokers Grp., Inc., 574 F. Supp. 2d 408, 421 (S.D.N.Y.

2008) (quoting <u>Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.</u>, 114 F. Supp. 2d 316, 323 (D.N.J. 2000)).

Here, the Amended Complaint alleges that GM's excess dealer inventory continued to rise after the IPO, as the result of GM's continuation of a pre-IPO practice or trend of channel-stuffing. A plaintiff may not, however, state viable Section 11 claims by relying solely on hindsight to prove a misstatement. <u>NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.</u>, 10 Civ. 440, 2012 WL 3191860, at*9 (S.D.N.Y. Feb. 9, 2012) (citing <u>In re Barclays Bank PLC Sec. Litig.</u>, 09 Civ. 1989, 2011 WL 31548 at *5 (S.D.N.Y. Jan. 5, 2011)). "Rather, the accuracy of offering documents must be assessed in light of the information available at the time they were published." <u>Id.</u> (internal quotation marks omitted).

In this case, the Amended Complaint fails to meet the plausibility standard established by <u>Twombly</u> and <u>Iqbal</u>, because it alleges no facts that, if true, would demonstrate that the Registration Statement contained a material misstatement or omission at the time it became effective. <u>See</u> <u>Iqbal</u>, 556 U.S. at 677. Lead Plaintiff alleges in a conclusory fashion that GM utilized "channel stuffing" in order to inflate revenue figures by accelerating revenue recognition that was unrelated to sales. By using this technique, Lead Plaintiff suggests, GM kept its stock price artificially high and concealed excessive inventory at the dealership level, which was not experiencing sufficient customer sales volume to justify the high inventory levels. The allegations of misstatements and omissions as to GM's inventory practices are supported neither by plausible factual allegations nor by the quoted passages from the Registration Statement, however.[7] The fundamental flaw of Lead Plaintiff's thesis is that is own Amended

---

[7] The parties debate whether the suggestion of fraud implicit in Lead Plaintiff's theory of nondisclosure would require that the Amended Complaint meet the Federal Rule of Civil Procedure 9(b) requirement that fraud be plead with specificity. It is

Complaint reflects public knowledge of the excessive inventory problem, through press coverage and GM disclosures, at all relevant times, and acknowledges that GM's disclosure in the Registration Statement identified the importance of customer-level sales figures in gauging revenue and inventory levels. Lead Plaintiff cites documentation demonstrating that GM disclosed information regarding its increasing inventories at the time the Registration Statement became effective. (See Am. Compl. ¶ 80.) Moreover, GM's Form 8-K, filed days before the IPO, fully disclosed inventory levels and sales levels for the previous month, and fully reflected growing dealer inventory volumes relative to sales. See GM's SEC Form 8-K, Nov. 3, 2010.[8] Under these circumstances, the Amended Complaint fails to state a material omission claim. Cf. Gavish v. Revlon, Inc., 00 Civ. 7291, 2004 WL 2210269, at *17 (S.D.N.Y. Sept. 30, 2004) ("[T]he question is whether the information stated in the complaint is sufficiently particularized to support a reasonable belief that, during the Class Period, Revlon was exacerbating this inventory imbalance by selling more inventory to retailers than retailers were selling to consumers and then making misstatements or failing to disclose information about that practice."); see also United States v. Schiff, 538 F. Supp. 2d 818, 834 (D.N.J. 2008), aff'd, 602 F.3d 152 (3d Cir. 2010) (noting significant shareholder losses after "nature and extent of the [issuer's] channel stuffing and buildup of excess inventory was disclosed . . . ."); Manson v. Muller, C 95-00016-MMC, 1995 WL 782176, at *1 (N.D. Cal. Oct. 12, 1995) (holding that

---

unnecessary for the Court to address that issue, however, because the Amended Complaint falls short of the basic pleading standard under Federal Rule of Civil Procedure 8.

[8] In determining whether an issuer failed to disclose any existing material fact, a district court may consider public filings, including SEC forms. See, e.g., La Pietra v. RREEF America, LLC, 738 F. Supp. 2d 432, 441-42 (S.D.N.Y. 2002); In re KeySpan Corp. Sec. Litig., 383 F. Supp. 2d 358, 373 (E.D.N.Y. 2003).

disclosures of increased channel inventory levels preclude a claim of securities fraud for "channel stuffing").

    Nor does Lead Plaintiff identify misrepresentations in the cited portions of the Registration Statement.  It is well settled that, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautions picture of current performance and future prospects."  Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000).  Furthermore, "expressions of puffery and corporate optimism do not give rise to securities violations."  Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).  Lead Plaintiff's attempt in paragraph 92 of the Amended Complaint to state a claim based on the Registration Statement's hopeful representation that "[w]e aim to increase our vehicle profitability by maintaining competitive incentive levels with our strengthened product portfolio and by actively managing our production levels through monitoring of our dealer inventory levels" is therefore unavailing.  See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, 75 F.3d 801, 811 (2d Cir. 1996) ("[S]tatements simply reflected company policy at the time; they were not promises to maintain that policy in the future, and thus were not rendered misleading by the company's subsequent consideration of an alternative plan.").  The Amended Complaint alleges no facts that would support an inference that GM did not, at the time the Registration Statement was issued, aspire to increase vehicle profitability through monitoring dealer inventory levels.  The simple allegation that GM failed to keep inventory levels at industry standard levels is not sufficient to render the statement that GM sought to improve inventory management inaccurate at the time of the effective date.

    Lead Plaintiff argues that GM's statements alleged in paragraph 92 were capable of "objective verification" and therefore cannot be treated as puffery.  It cites three cases for the

proposition.  All three of the cases upon which Plaintiffs rely deal, however, with misrepresentations as to past events and therefore lend no support to their claims here, which allege misrepresentations as to future corporate goals.  In Tower Auto Securities Litigation, 483 F. Supp. 2d 327, 336 (S.D.N.Y. 2007), overruled in part by Stoneridge Inv. Partners, LLC v. Scientific–Atlanta Inc., 552 U.S. 148, 161, 171 (2008), a statement that a company had "extract[ed] significant cost savings and synergies" from the acquisitions of certain companies was misleading because the company had not achieved cost savings or synergies, claims that clearly concerned verifiable matters.  Plaintiffs also rely on Ambac Financial Group, Inc. Securities Litigation, where plaintiffs alleged that the company had misstated the performance of its Collateralized Debt Obligations portfolio by representing that it did not mirror the performance of a certain market index.  The market index reference concerned a verifiable reality that predated the statement, not the hopeful policy goals of the company.  See 693 F. Supp. 2d 241, 272 (S.D.N.Y. 2010).  Finally, Lead Plaintiff cites Novak v. Kasaks, which held that statements that inventory was "in good shape" or "under control" were verifiable.  Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000) (citing In re Prudential Sec. Inc. Ltd. Partnerships Litig., 930 F.Supp. 68, 74–75 (S.D.N.Y. 1996)).  The Novak court explicitly limited its holding regarding inventory to "misrepresentations of existing facts."  These statements of existing facts are in a wholly different category from GM's forward-looking, aspirational statements regarding inventory management.

        The second alleged misstatement identified in paragraph 92 of the Amended Complaint is also aspirational puffery.  Lead Plaintiff alleges that the Registration Statement "stated that pricing vehicles competitively, and improved inventory management, will continue to strengthen the reputation of our brands and continue to improve our average transaction

price," and that the phrase was inaccurate because "GM had reverted back to, and intended to continue, its old inventory precipices whereby the Company [, Old GM,] produced and delivered its dealers excessive levels of inventory."  (Docket entry no. 69 at pg. 9.)  However, the passage from which the fragment quoted in the last sentence of paragraph 92 was drawn was plainly forward-looking and policy-oriented.  In a paragraph captioned "Product Pricing," GM stated that it "[w]ill continue to price vehicles competitively . . ." and that the company "believe[s] that this strategy, coupled with improved inventory management," will continue to strengthen the company's performance.  Lead Plaintiff proffers no non-conclusory factual allegations showing that GM did not intend to improve inventory management at the time the Registration Statement went effective, nor does it allege that GM failed to try to improve its average transaction price.  There is no allegation that GM failed to price its vehicles competitively.  Instead, the Amended Complaint relies on backward-looking logic to argue that the statements were false, claiming that GM must have intended to manage its inventory poorly because, after the IPO, its inventory continued to increase.  Plaintiffs may not state a claim for Section 11 liability based on mere hindsight.  See NECA-IBEW, 2012 WL 3191860, at *9.

    Lead Plaintiff's allegation regarding the alleged misstatement identified in paragraph 94 of the Amended Complaint similarly fails to identify any inaccuracy.  Lead Plaintiff alleges that GM's statement that inventories had increased "primarily" due to two causes – increased production due to higher demand and lower inventory levels the year before due to "year-end shut-down of certain locations" – was misleading because the increased inventories were the result of "channel stuffing," not increased demand.  It is, however, undisputed that demand rose in 2010.  Furthermore, GM disclosed precisely the amount of increased demand for its vehicles (5.9% in the first three quarters of 2010), and it disclosed the

nearly 30% increase in inventory during that same period. (GM Registration Statement at 60; Docket entry no. 69 at pg. 13 n. 9.) Any excess of inventory was therefore a matter of public record. GM's public filings preceding the IPO demonstrate that these sales and inventory figures were public information at the time the Registration Statement became effective. In fact, Plaintiffs cite news reports that confirm that participants in the stock market had reviewed the public information and determined that GM's inventory levels were higher than normal. GM's statements in the Registration Statement were therefore consistent with reasonably available public information. GM had no obligation to label its inventories "excessive" or otherwise denigrate its performance in order to make its disclosure not misleading. See Novak, 216 F.3d at 309.

Plaintiffs' allegations regarding the statement identified in paragraph 96 of the Amended Complaint are also unavailing. Having acknowledged in their motion opposition papers that the Registration Statement language quoted in paragraph 96 accurately points to vehicle sales data as the proper barometer of revenues, Plaintiffs nonetheless assert that the vehicle sales data disclosed in the Registration Statement were misleading because they were based in large part on estimated, rather than actual, sales data. GM disclosed the source and nature of the sales figures, however, and Plaintiffs do not even allege that the estimates deviated materially from actual sales in the relevant areas. The Amended Complaint therefore fails to state a misrepresentation claim as to the Registration Statement passages quoted in paragraph 96.

Finally, Plaintiffs allege that GM violated its affirmative disclosure obligations by omitting material information from the Registration Statement in that it failed to disclose GM's "channel stuffing" behavior as a negative "trend." Item 303 of Regulation S-K requires disclosure of any known trends or uncertainties that a registrant reasonably expects would have a

material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  17 C.F.R. § 229.303(a)(3)(ii).  A registrant is also required to disclose all material information necessary to make statements in the offering document not misleading.  17 C.F.R. § 230.408.  A plaintiff need only "plausibly allege that [the registrant] omitted material information that it was required to disclose or made material misstatements in its offering documents, [to] meet the relatively minimal burden of stating a claim pursuant to Section[] 11 . . . , under which, should plaintiffs' claims be substantiated, [a defendant's] liability as an issuer is absolute."  Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 718 (2d Cir. 2011).  However, where an issuer has disclosed material negative trends for sales or revenue, it need not cloak the company's outlook in overt negative terms, or characterize the company's behavior or future outlook in the "most unflattering light possible."  See Solow v. Citigroup, Inc., 10 Civ. 2927, 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012), aff'd, 507 F. App'x 81 (2d Cir. 2013); Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.").

        Here, GM had disclosed its increasing inventories and relatively slower growth in sales of vehicles to consumers.  Labeling its historical inventory issues as a "trend" was not necessary to comply with Regulation S-K.  See In re Canandaigua Sec. Litig., 944 F. Supp. 1202, 1211 (S.D.N.Y. 1996) ("S–K 303's mandate to disclose material 'trends and uncertainties' does not contemplate furnishing competitors with an analytical blueprint of a company's business strategies.").  Nor does Plaintiffs' assertion that GM ought to have expressed its inventory disclosures in terms of "days supply" suffice to state a claim.  GM had disclosed all of the information necessary to determine days supply at the time of the IPO.  In November 2010,

the same month as the IPO, GM disclosed the precise inventory level of 515,000 units in October 2010, the vehicle sales to customers of 183,759 units, and the number of sales days in that month.  Lead Plaintiff acknowledges in the Amended Complaint that, from these figures, any reasonable investor could readily determine GM's days supply of dealer inventory.  (See Am. Compl. ¶ 64.)  That GM did not characterize this increase in inventory as "channel stuffing" or accuse itself of "building up excess inventory on dealer lots," does not render the disclosure document actionable, because GM need not characterize events in the most negative way possible as long as the particular negative trend is conveyed to investors.  Plaintiffs have thus failed to state a claim for material omission.

    Plaintiffs also assert Section 15 claims against the Individual Defendants.  Section 15 provides a cause of action against "[e]very person who . . . controls any person liable under [Sections 11] of this title."  15 U.S.C. § 77o.  A claim under Section 15, therefore, can only succeed if a plaintiff can first demonstrate liability under Section 11.  See In re Morgan Stanley, 592 F.3d at 358.  Since Plaintiffs have failed to state a claim under Section 11, their Section 15 claims necessarily fail as well.

    Defendants raise a statute of limitations defense, which the Court need not address in light of its conclusion that the Amended Complaint fails to state a claim upon which relief may be granted.

    In its opposition brief Lead Plaintiff seeks leave to further amend the Amended Complaint.  (Docket entry no. 69 at 25, n. 21.)  Lead Plaintiff opted to stand on its Amended Complaint following Defendants' filings of the instant motions to dismiss, acknowledging on the record that no further leave would be granted to address issues raised in the motion practice.  Its request is, accordingly, denied.

CONCLUSION

For the foregoing reasons, the Amended Complaint is dismissed with prejudice in its entirety. This order resolves docket entry numbers 57 and 61.

The Clerk of the Court is requested to enter judgment dismissing the Amended Complaint and close this case.

SO ORDERED.

Dated: New York, New York
       September 15, 2014

                                                /S/ Laura Taylor Swain
                                              LAURA TAYLOR SWAIN
                                              United States District Judge